IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| NICHOLAS TEMPLETON,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF DES MOINES, IOWA; ANDREWBECKER, MATHIEU DAHLEN, and BRIAN CUPPY, in their individual and official capacities,,<br><br>    Defendants. | Case No. 4:21-cv-188<br><br><br><br>**BRIEF IN SUPPORT OF RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

**Page**

BACKGROUND FACTS ............................................................... 3

DAHLEN BODY CAM................................................................ 5

ROBERT CROUSE BODYCAM................................................... 7

SUMMARY JUDGMENT STANDARD......................................... 10

ARGUMENT ............................................................................ 11

I.     OFFICERS BECKER, DAHLEN AND CUPPY ARE NOT ENTITLED TO QUALIFIED IMMUNITY ......................................................... 11

     A.    Templeton's Constitutional Rights Were Violated................................. 12

          1.    Application of the *Kingsley* Factors.............................................. 15

     B.    Templeton's Constitutional Rights Were Clearly Established ................ 22

II.    IOWA CONSTITUTIONAL LAW CLAIMS.................................... 29

     A.    Iowa Code § 670.4A Does Not Apply Retrospectively.......................... 29

     B.    Applying Section 670.4A to Plaintiff's Claims Violates his State and

Federal Due Process Rights ...................................................... 31

C.   Applying Section 670.4A to Plaintiff's Iowa Constitution Claim
Offends the Principals of Separation of Powers ...................................... 32

D.   Defendants are Not Entitled to Immunity Under the All-Due-Care
Standard ................................................................................... 35

1.   *Baldwin II and the All-Due Care Affirmative Defense* ................ 35

2.   *The Contours of the All-Due Care Affirmative Defense* .............. 36

3.   *Application of Baldwin Qualified Immunity Affirmative
Defense* ............................................................................ 38

III.   TEMPLETON'S CLAIMS ARE NOT TIME-BARRED .................................. 39

A.   Templeton's Amended Complaint Relates Back to the Original Filing
on May 14, 2021 ......................................................................... 39

1.   Defendants Cuppy and Dahlen ..................................................... 39

2.   The Relation Back Doctrine is Satisfied With Respect to
Defendant Becker ..................................................................... 40

3.   Negligent Supervision and *Respondeat Superior* Liability ......... 43

COMES NOW, Plaintiff Nicholas Templeton ("Templeton"), by and through his attorneys, and for his Brief in Support of his Resistance to Defendants' Motion for Summary Judgment states as follows:

## BACKGROUND FACTS

On May 15, 2019, Nick Templeton was an employee of the Iowa Department of Administrative Services working as a groundskeeper at the Iowa State Capitol complex.  (P. App. 000003; Templeton Declaration ¶ 2)  On that same day he went to lunch with his mother at the Tasty Taco located near the Capitol. (*Id*. at ¶3)   He recalls leaving the restaurant to go back to work. (*Id*. at  ¶4)  His next memory is waking up at Lutheran Hospital.  (*Id*.at ¶4-5)

This gap in Templeton's memory is the direct result of a seizure he experienced while driving back to work. (Defs. App. 29; Amended Complaint Petition ¶ 12)   As a result of the seizure, he lost control of his Jeep Cherokee and drove into the grass north of Court Avenue near the Hoover Building.  Several bystanders saw this happening and called 911, telling the dispatcher that it appeared that the driver was having a seizure. (P, App. 000102; 911 Audio) Two Des Moines police officers  (Fong and Noble) who were working undercover happened to drive by and saw Templeton's vehicle off the roadway with a group of people nearby trying to communicate with its occupant.  (P.App. 000004-000016)

According to Fong and Noble, they had difficulty getting Templeton out of the car. (P. App. 000011-000015) Once out of the car, Fong and Noble described Templeton as "non-compliant" and "resisting." (*Id*.)  The reports from Fong and Nobel describe wrestling Templeton to the ground, placing him a prone position and handcuffing him behind his back. (*Id*.)  Around this time, several officers from the Des Moines Police Department, an Iowa State

3

Trooper (Captain Logsdon), and an officer from the Firth District Department of Corrections (Kness) converged on the scene.

Officer Noble noted that upon making eye contact with Templeton, "he appeared to be in an altered state of mind." (P.App.000011)   Fong stated in his report that he initially thought Templeton was under the influence of methamphetamine or a similar type stimulant. . ." (P.App.15)   None of these highly trained police officers were able to discern what several members of the public readily understood; that Templeton was having a medical emergency. (P.App.000102; 911 Audio) Perhaps due to lack of training or just well-engrained cynicism; all law enforcement on the scene simply assumed that Templeton's behavior was the result of illicit drug use.  As a result, Templeton was placed in a prone position, hog-tied with a hobble restraint while a knee was placed across his upper back.  Another officer shoved Templeton's feet/ankles toward his wrists.

The Des Moines Fire Department arrived on the scene and documented the following:

> **The patient was hog-tied with his hands and feet cuffed behind his back and then held together with a black strap. There were two police officers lying on top of the patient holding him down against the ground, one was on his back the other on his legs . .** . While personnel began checking his vitals, I tried speaking with the patient.  He was talking, but reluctant to answer questions.  He stopped talking, but was clearly still breathing.  **Shortly after the color of his face became abnormal, it looked a purplish blue. The patient was no longer resisting the officers lying on him**.  We asked that they get off so we could roll him over.  His respirations were now sonorous.  We ask that PD quickly remove the restraints so we could position him appropriately on our cot in an upright seated position.  His color almost immediately improved and his respirations were adequate and no longer sonorous. (P. App. 000019)

The best depiction of what occurred that day is not the after-the-fact deposition testimony of the officers on scene, but the bodycam footage of Officers Dahlen and Sergeant Crouse.   A summary of that footage is as follows:

**DAHLEN BODY CAM**:

1:00:   Arrives on scene.

1:02:   Dahlen approaches/Templeton is on his side

1:09:   Dahlen asks:  "What do you need, guys?"   Fong "Hobble. Do you got a hobble."

1:12:   Dahlen asks Officer Cuppy for a hobble.  Cuppy replies: "I don't."

1:26:   Dahlen takes handcuffs from his squad car.

1:43- 2:09:  Templeton is on his side/back.  Fong is restraining Templeton's feet.  Templeton is not resisting.

2:10:   Templeton is rolled into prone position and handcuffed from behind.  He begins crying repeatedly for "help" or "please help."

2:29:   Fong:  "I think he's on drugs."  Templeton:  "No, I'm not."

2:46:   Templeton:  "My hands!"  and "I need water."

3:04:   Fong and Noble rotated out.  Kness (on left side) and Cuppy on right side of Templeton.  Templeton is prone, handcuffed with his feet bound.  He is not actively resisting.

3:24:   Templeton: "I can't breathe."  Repeated four times.  He is crying out for help.

3:54:   Fong asks:  "Does anyone have a hobble?"

4:07;   Templeton is prone and handcuffed behind his back.  Kness and Cuppy are applying pressure to his back.  Templeton is moving, but not resisting.

4:16;   Templeton is saying "Ohhh" multiple times.

4:32:   Templeton is prone and handcuffed.  Kness is applying pressure across Templeton's upper back. Cuppy/Kness are holding Templeton's handcuffed hands against his back.  (See screenshot below.)



5:24:   Becker [backwards baseball cap] appears and applies the hobble restraint. Templeton is not and has not been resisting.

5:47:   Hobble fully applied—Templeton is in a prone position and not resisting.

6:19:   Paramedics arrive on scene.

7:50:   Sgt. Crouse asks his name. Templeton responds with his name.  He is not resisting.

8:57:   Templeton is not moving.

9:10:   Paramedic:  "Nick are you asleep?"   A paramedic taps Templeton on the side of the head.

10:16: Unidentified person:  "Is he still pushing?"  Unidentified person responds " No, he stopped pushing."

10:59:  Templeton rolled onto his side:  Paramedic: "Can we get the restraints off."

11:23:  Templeton placed on stretcher by paramedics.

## ROBERT CROUSE BODYCAM:

3:12:   Arrives on scene.

3:55:   Templeton can be heard screaming.

5:19:   Templeton is prone and handcuffed.  Dahlen kneeling on Templeton's feet and
Cuppy is kneeling against his side.



5:25:   Becker asks for a hobble.  Templeton is not resisting.

5:37:   Dahlen replies:  "There is probably one [hobble] in my bag."

7:01:   Templeton is hobbled in a prone position.  Dahlen has his right knee
across his buttocks and both hands on his upper back. Templeton is not
resisting.

7:36:   Templeton is moving his feet, but not resisting. Dahlen places his left knee
and left hand across Templeton's upper back.  Sergeant Becker is present.
Note that the video shows Dahlen applying direct pressure from 7:36
through 9:23.



8:10:   Templeton is moving his feet. Dahlen pulls his feet within inches of his hands.



8:40    Cuppy is holding Templeton's feet up to his hands.  Dahlen continues kneeling on
         Templeton.



9:45:    Paramedic asks:  "Nick are you asleep?"  Cuppy continues holding
          Templeton's feet within inches of his hands.

10:45:   Templeton's right arm is twitching.  Cuppy continues holding his feet up
          toward his hands.

10:57:   Cuppy continues holding his feet up to Templeton's hands.

11:23:   Templeton rolled onto his side.

11:40:   The hobble is removed.

11:59:   Templeton is placed on stretcher.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court's duty is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[A]t the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). The court's inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted). However, "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657. "The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system . . . the fundamental principle [is] that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 660. When considering a motion for summary judgment, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## **ARGUMENT**

I.    **OFFICERS BECKER, DAHLEN AND CUPPY ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Templeton alleges that Officers Becker, Dahlen and Cuppy used excessive force in violation of the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Iowa constitution. The individual officers assert that they are entitled to the qualified immunity which "shields government officials from civil damage liability for discretionary action that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), *reh'g denied* (June 5, 2017), *cert. denied*, 2018 U.S. 753 (2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not available "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [individual], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury.' " *Harlow*, 457 U.S. at 815, 102 S.Ct. 2727 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975).

The determination of whether an officer is entitled to qualified immunity, involves a two-step analysis: (1) whether the alleged facts, when viewed in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a constitutional right; and (2) whether the constitutional right being asserted is clearly established. *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (cited cases omitted). "If either question is answered in the negative, the public official is entitled to qualified immunity." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoted case omitted). "To avoid pretrial dismissal, a plaintiff must present facts showing the violation of a constitutional right that was clearly established at the time of defendant's act." *De La Rosa*, 852 F.3d at 743.

A.        **Templeton's Constitutional Rights Were Violated**

Under the Fourth Amendment, the test for determining whether excessive force was used under the first prong of the analysis is whether "the amount of force used was objectively reasonable under the particular circumstances." *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). The Court determines "whether a use of force was reasonable by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989).

In assessing whether an officers' actions are "objectively reasonable" a "court (judge or jury) cannot apply this standard mechanically."  *Kingsley v. Hendrickson*, 576 U.S. 389,397 (2015).  Instead, the inquiry "requires careful attention to the facts and circumstances of each particular case."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The U.S. Supreme Court in *Kingsley* laid out several factors to be considered in making this determination: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley*, 576 U.S. at 397.

The U.S. Supreme Court's analysis in *Lombardo v. City of St. Louis*, 141 S. Ct. 2239 (2021) is highly instructive on the issue of whether a constitutional violation occurs when a suspect is handcuffed in a prone position.  Although the suspect in *Lombardo* was highly combative, the officers did not use a hobble restraint.  Instead, they handcuffed and leg shackled him in a prone position and applied pressure to his back and torso. *Id.* at 2240.  The U.S.

Supreme Court reversed the granting of summary judgement on the excessive force claim.

In *Lombardo*, the St. Louis police arrested Nicholas Gilbert for trespassing and failing to appear in court for a traffic violation. *Id.* He was brought to the police station and placed in a holding cell. *Id.* The officers saw Gilbert tie a piece of clothing around his neck in an apparent suicide attempt. *Id.* Three officers then entered his cell. One of the officers attempted to handcuff him, but he evaded the officer and began to struggle. *Id.* The three officers eventually brought Gilbert down to a kneeling position over a concrete bench in the cell and handcuffed his arms behind his back. *Id.* Gilbert continued to resist, kicking the officers and hitting his head on the bench. *Id.* While Gilbert continued to struggle, two officers shackled his legs together. More officers joined the mele, until six officers were present in the holding cell. *Id.* Gilbert was eventually handcuffed behind his back, placed in leg irons, and put in a prone position, face down on the floor. *Id.* Three officers held Gilbert's limbs down at the shoulders, biceps and legs. Another officer placed pressure on Gilbert's back and torso causing him to try and raise his chest and say: "It hurts. Stop." *Id.* After 15 minutes of struggling, Gilbert's breathing became abnormal and he stopped moving. *Id.* He was later transported to the hospital and pronounced dead. *Id.*

The officers in *Lombardo* argued that they were qualifiedly immune. The District Court agreed, finding that the officers did not violate a constitutional right that was clearly established. *Lombardo v. City of Saint Louis*, 361 F.Supp.882, 895 (2019). The Eighth Circuit affirmed on different grounds instead holding that the officers did not apply unconstitutionally excessive force. *Lombardo v. City of St. Louis*, 956 F.3d 1009, 1014 (8th Cir. 2020). The Eighth Circuit found that the undisputed facts showed that Gilbert continued to violently struggle even after being handcuffed and leg-shackled. The undisputed evidence also showed that Gilbert was only

held in the prone position until he actively stopped fighting against his restraints and the officers. Once he stopped resisting, Gilbert was rolled out of the prone position onto his side.   The Eighth Circuit cited *Kingsley* and, after listing those factors, held that the officers' actions were not unconstitutionally excessive:  "This Court has previously held that the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directives and efforts to subdue the detainee."  *Id*. at 1013.

The case was appealed to the U.S. Supreme Court which vacated the judgment in favor of the officers and remanded.  *Lombardo v. City of St. Louis*, 141 S. Ct. 2239 (2021). The Court's reasoning for overturning the Eighth Circuit's decision was as follows:

> Although the Eighth Circuit cited the *Kingsley* factors, it is unclear whether the court thought the use of a prone restraint—no matter the kind, intensity, duration, or surrounding circumstances—is *per se* constitutional so long as an individual appears to resist officers' efforts to subdue him. The court cited precedent for the proposition that "the use of prone restraint is not objectively unreasonable when a detainee actively resists officer directives and efforts to subdue the detainee." The court went on to describe as "insignificant" facts that may distinguish that precedent and appear potentially important under *Kingsley*, including that Gilbert was already handcuffed and leg shackled when officers moved him to the prone position and that officers kept him in that position for 15 minutes. . . . Such details could matter when deciding whether to grant summary judgment on an excessive force claim. *Id*. at 2241.  (citations omitted).

The Court's concern was that by failing to analyze the other *Kingsley* factors, the Eighth Circuit's opinion "could be read to treat Gilbert's 'ongoing resistance' as controlling as a matter of law.  Such a per se rule would contravene the careful context-specific analysis required by the Court's excessive force precedent."  *Id*. at 2242.

1.      **Application of the *Kingsley* Factors**

The Court in *Lombardo* found the following facts pertinent to the *Kingsley* analysis:

> Here, for example, record evidence (viewed in the light most favorable to Gilbert's parents) shows that officers placed pressure on Gilbert's back even though St. Louis instructs its officers that pressing down on the back of a prone subject can cause suffocation.  The evidentiary record also includes well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk.  The guidance further indicates that the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands. Such evidence, when considered alongside the duration of the restraint and the fact that Gilbert was handcuffed and leg shackled at the time, may be pertinent to the relationship between the need for the use of force and the amount of force used, the security problem at issue, and the threat – to both Gilbert and others—reasonably perceived by the officers. *Id*. at 2241.

In this case, Defendant Becker was designated to testify concerning the training of DMPD officers with respect to the use of force and physical restraints including the hobble restraint.  (Defs. App. 202-203; Defs. App. 171; Becker Dep. 12-13)   Becker has taught the "In Custody Deaths and Asphyxiation" course since 2016.  (Defs. App. 83-105; Defs. App.  174; Becker Dep. 23-24)  He is also the person who applied the hobble restraint to Templeton.  The PowerPoint presentation given by Becker to police recruits includes a section on "Positional and Restraint Asphyxia" which makes the following statement:

> **Most people will tense their muscles when restrained or move forcefully against their will.**  In a case of restraint asphyxia, the cause of death is usually a combination of exhaustion, exertion, fear and restricted breathing due to restraint or the use of force.  The cause of death in positional asphyxia may involve restraint but is more likely associated with leaving an exhausted, drug affected and unconscious person in a position that results in asphyxia.  **The phrase "restrain asphyxia" will raise concerns about the reasonableness of the use of force and restraint.  Death by asphyxia is believed to be a horrific experience for which the individual will exert tremendous physical effort in order to breath**.  (Defs. App. 86)

Thus, DMPD police recruits are told that persons handcuffed in a prone position will engage in involuntary forceful movements and "exert tremendous physical effort" to try and breath because of their compromised position.   DMPD officers are trained on the "Use of Force" policy which provides that "Physical force shall not be used against individuals in restraints, except as objectively reasonable to control or prevent their escape or prevent imminent bodily injury to any person."  (Defs. App. 199)  Officer Becker clarified that DMPD policy allows an officer to kneel on the shoulder/upper area of a prone handcuffed suspect, but the officer should stay away from applying pressure to the neck and spine.  (Defs. App. 181; Becker Dep. 51)

The DMPD Use of Force policy also cautions that restrained individuals should not be left in a prone position any longer than necessary:  "Officers shall minimize the risk of positional asphyxiation by avoiding prolong periods in the prone position and should reposition the individual on their side or sitting or standing." (Defs.App. 199)   The In-Custody Deaths and Asphyxiation training likewise provides:  "Once the suspect has been secured in the hobble restraint place them on their side to avoid respitory [sic] problems."  (Defs. App.99)  The photograph below is from the "In Custody Deaths and Asphyxiation" PowerPoint used by Becker to train officers on the proper use of the hobble restraint. (Defs. App.99)



ONCE THE SUSPECT HAS BEEN SECURED IN THE HOBBLE RESTRAINT PLACE THEM ON THEIR SIDE TO AVOID RESPITORY PROBLEMS

However, training officer Becker testified that the hobbled suspect does not need to be placed on their side until "compliance and control" is achieved.  (Defs. App. 178; Becker Depo. 39)  Becker testified:  "Again, if this person is still kicking, thrashing around, flailing around, we don't have control of them, so to speak, we can't move them."  (Defs. App. 178; Becker Dep. 39)  The instructions given to officers about the use of the hobble restraint contain restrictions and limitations on its use:

- The hobble should only be used on an actively combative person:  "This type of restraint [hobble] is used to gain or maintain control of an actively combative person that poses a threat of injury to himself or others."  (Defs. App. 90)

- The distance between the hands and feet should be at least 24 inches.  (Defs. App. 90)

- DMPD policy is violated if the distance between the hands and fee is between 12 inches and 24 inches.  (Defs. App. 176; Becker Dep. 31-32)

- A hobble restraint where the distance between the hands and feet is 12 inches or less is considered a "hog-tie."   The training PowerPoint cites the Tenth Circuit's decision in *Cruz v. City of Laramie* and states that utilizing the hobble with a distance of 24 inches "would be in accordance with standards of the courts and reduce negligent liability." (Defs. App. 89)

In viewing the video and other evidence in a light most favorable to Templeton, the court could easily find that handcuffing and later hobbling/hogtieing Templeton in a prone position for a prolonged period of time was unnecessary, life-threatening, and unconstitutional:

- Templeton was not actively combative, kicking, thrashing, or flailing just prior to or after the hobble was applied.  Templeton has retained expert Michael Lyman, Ph.D., who will testify consistent with his report that the application of the hobble was completely unnecessary because "when Templeton was hobbled, he was not actively combative or posing a threat of injury to himself or others. While Templeton was verbal by moaning, groaning and calling out for help, his verbalizing did not constitute any degree of threat or risk of injury to officers or anyone else." (P. App. 000038)

- DMPD officers were trained that "Most people will tense their muscles when restrained or move forcefully against their will."  (Defs. App.86)  Expert Lyman will testify consistent with his report that:  "Considering the extent he is moving (very little based on video), one could reasonably infer that this was because of his ability to breathe was compromised due to his being in a face down, prone position.  Thus, a certain amount of flailing to facilitate breathing would be a reasonable expectation." (P. App.000039)

- Officer Dahlen admitted that it was possible that if Templeton was resisting, it was because he couldn't breathe.  (Defs. App. 219; Dahlen Dep. 30)

- While Templeton was prone and handcuffed and later hobbled/ hogtied, Officer Dahlen applied pressure to his back.   Dahlen is 6 feet tall and weighs 280 pounds. (Defs. App. 218; Dahlen Dep.28)  While Officer Dahlen claims that he was not applying pressure to Templeton's back; reasonable minds could differ on that claim after viewing the video evidence as depicted in the screen shot below:



- The assertion that no pressure was being applied to Templeton while in the prone position is belied by Des Moines Fire Department personnel who arrived on the scene and observed:  "The patient was hog-tied with his hands and feet cuffed behind his back and then held together with a black strap. **There were two police officers lying on top of the patient holding him down against the ground, one was on his back the other on his legs** . . ."  (P.App.000019)(emphasis added)

- According to existing precedent, and training given by the DMPD, a "hog-tie" is defined as application of the hobble restraint where the distance between the hands and feet is less than 12 inches.   Despite Officer Becker and Dahlen's testimony that the distance between the hands and feet was more than 24 inches, the video evidence viewed in a light most favorable to Templeton demonstrates the hobble was applied in a hog-tie fashion as depicted in the photo below from the Crouse body camera from 7:19-7:55 and the Dahlen Body Camera at 5:58.



- Assuming arguendo that the hobble strap was 12-24 inches, Cuppy and Dahlen forced Templeton's hands and feet well within 12 inches thereby making the restraint a hogtie by definition. Expert Lyman notes: "Even if it is to be believed that the hobble strap was the required 24" in length, Dahlen can be seen forcefully pressing Templeton's feet toward and into his wrists. This completely defeats the purpose of the 24" distance guideline." (P. App. 000040)

- Sergeant Crouse's body camera at 5:19 shows Templeton prone and handcuffed. Templeton remains prone and handcuffed when the hobble is applied at 7:21. He is not rolled onto his side until 11:23. For more than six minutes, Templeton is prone, handcuffed and later hobbled with officers at various times applying pressure to his back and forcibly pushing and holding his hands and feet together.

The City argues that because Templeton survived this horrific event, this case is dissimilar to,

and therefore less worthy of constitutional protection than, cases where the person succumbed to

their injuries.  However, there is no requirement in *Kingsley* or any other case that death is a prerequisite for the assertion of a constitutional right.  David Glaser, M.D., an emergency room physician[1], reviewed the photographs, body camera videos and the medical records in this case. Dr. Glaser will testify concerning the insult to Templeton's person that occurred during this excessive restraint and that death and/or irreversible brain injuries were mere minutes away:

> It is clear to me from the materials reviewed, that while prone, in the "hog-tied" position with two police officers on top of him holding him down, Mr. Templeton suffered a brief respiratory arrest. This occurred because his ventilations were seriously comprised by the combination of being in the prone hog-tied position with pressure being applied to his back. When someone's ventilation is sufficiently impaired, arterial oxygen levels drop below what the brain requires to stay conscious. Had respirations not been reestablished by removing the hog-tie restraints and repositioning him as was done by EMS personnel, he more likely than not would have sustained irreversible anoxic brain injury within 3-6 minutes and would have entered full cardiac arrest followed by death shortly thereafter. (P. App. 000056)

In addition to this near-death experience, Templeton's hands and wrists sustained injury due to the prolonged restraint.  Templeton testified that after his arrest that his wrists were bleeding, that he has scars from the handcuffs and that the hobble rubbed the surgical screws in his ankle causing them to bleed.  (D.App. 126; Templeton Dep. 26) Below is a photograph of Templeton's ankle taken shortly after the event.[2]

---

[1] Dr. Glaser's CV is found at P.App.000057-000066.
[2] The photograph can also be found at Defs. App. 41.



**B.      Templeton's Constitutional Rights Were Clearly Established**

This court must construe the facts in a light most favorable to Templeton in determining

whether a constitutional violation occurred and whether the constitutional right was clearly

established.  *K.W.P. v. Kansas City Public Schools*, 931 F.3d 813, 821 (8th Cir. 2019)   "For a

constitutional right to be clearly established, there does not have to be a previous case with

exactly the same factual issues*." Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009), *citing*

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Determining whether a right is clearly established

requires "identify[ing] a case where [the official] acting under similar circumstances . . . was

held to have violated [a Constitutional right]." *Anderson v. Creigh*ton, 483 U.S. 635, 640 (1987). The proper inquiry in this case is whether a reasonable officer would have understood that placing a suspect in a prone position, handcuffed and later hobbled, for more than six minutes while applying pressure to his back to the point where he was rendered unconscious was an excessive and therefore unconstitutional use of force.

As previously noted, the training given to DMPD officers discusses, quotes and cites with approval *Cruz v. City of Laramie*, 239 F.3d 1183. (10ᵗʰ Cir. 2001). (Defs.App. 89)  In *Cruz*, the officers were confronted with a suspect who was naked, jumping up and down, yelling and kicking his legs in the air. *Id*. at 1186.  In an effort to subdue him, the officers tied his arms behind his back, bound his ankles together and secured his wrists to his ankles and then placed him face down. *Id*. at 1188.  Relying on precedent from other circuits, the Tenth Circuit defined a restraint where the distance between the hands and feet was 12 inches or less a "hog-tie."

As noted in the DMPD training materials, *Cruz* did not find a hog-tie by definition unconstitutional, but did hold that the technique may not be applied when an individual's diminished capacity is apparent. *Id*. at 1188.  The Tenth Circuit in Cruz found that:  "The diminished capacity might result from severe intoxication, the influence of controlled substances, a discernable mental condition, or any other condition, apparent to the officers at the time, which would make the application of a hog-tie restraint likely to result in any significant risk to the individual's health or well-being."[3] *Id*.  The court notes that Cruz' diminished capacity was apparent to the officers both before and after they applied the hobble restraint:  "We conclude and hold that the fourth amendment protection against excessive force includes the protection of

_____

[3] The diminished capacity language from Cruz is also found in the DMPD training materials. (D.App. 88; D. App. 176; Becker Dep. 30)

an individual's right to be free from a hog-tie restraint in situations such as the one confronting the officers herein." Id.

In construing the facts in a light most favorable to Templeton, the officers here applied the hobble restraint in a hog-tie fashion allowing less than 12 inches between his hands and feet. Assuming arguendo, that the hobble strap was more than 12 inches, Officers Dahlen and Cuppy pushed Templeton's wrists and ankles together creating the same potentially lethal hog-tie position.  In addition, as instructed by *Cruz* (and taught in their training) the use of a hog-tie should never be used when the individuals' diminished capacity is apparent. (Ex. 4, p. 6)  In this case, Templeton's diminished capacity was readily apparent.  A member of the public made a 911 call and correctly stated that Templeton was having a seizure. (P.App.000102; 911 Audio). Officers Noble and Fong believed he was on methamphetamines and several officers on the bodycam footage can be heard saying "he's on something."  In either case, Templeton was in a state of  "diminished capacity" and all of the DMPD officers on scene were trained that a hobble restraint should not have been used.

In *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit expounded on n *Cruz* by clarifying the constitutional contours of the use of prone restraints. Mr. Weigel was in a car accident, appeared inebriated and was acting in a bizarre fashion including attempting suicide by walking in front of moving vehicle. *Id*. at 1148.  In response to attempts to subdue him, Weigel fought vigorously, repeatedly trying to take the troopers' weapons and evade handcuffing.  *Id*.  He was eventually handcuffed with his feet bound and then placed in a prone position.  *Id*.  His feet and hands were not tied together in any fashion. Weigel continued to struggle and the troopers, in an attempt to gain control, placed their body pressure on Weigels'

neck, upper back, upper thighs and buttocks.  *Id.*   As a result of his positioning and the weight

applied to his back, Weigel went into cardiac arrest and died.  *Id.* at 1149.

The *Weigel* court citing *Cruz* found that "a reasonable officer would have known that the

pressure applied on Mr. Weigel's upper back as he lay on his stomach created a significant risk

of asphyxiation and death.  His apparent intoxication, bizarre behavior, and vigorous struggle

made him a strong candidate for positional asphyxiation." *Id.* at 1152.  The court noted that the

officers' training materials discussed in detail the danger of positional asphyxiation; particularly

from placing weight on the upper torso and back.[4]  *Id.*

*Weigel* was decided in 2008 and reiterated what was already clearly established law; that

restraining a suspect in a prone position and then applying pressure to the back for an

unnecessary period of time violates the Fourth Amendment:

> The Fourth Amendment prohibits unreasonable seizures.  We do not think it
> requires a court decision with identical facts to clearly establish that it is
> unreasonable to use deadly force when the force is totally unnecessary to restrain
> a suspect or to protect officers, the public, or the suspect himself. Yet, as
> explained above, there is evidence that this is what happened here:  even after it
> was readily apparent for a significant period of time (several minutes) that Mr.
> Weigel was fully restrained and posed no danger, the defendants continued to use
> pressure on a vulnerable person's torso while he was lying on his stomach.  A
> reasonable officer would have known these actions present a substantial and
> totally unnecessary risk of death to the person.

*Id.* at 1155; *See, Champion v. Outlook Nashville, Inc*., 380 F.3d 893,903 (6th Cir. 2004)(it is

clearly established "that putting substantial or significant pressure on a suspect's back while that

suspect is in a face-down prone position after being subdued and/or incapacitated constitutes

excessive force."); *Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013, 1019-20 (S.D. Ohio

---

[4] The evidence showed that the troopers placed this pressure on him longer than what was necessary:  "In short,
there is evidence that for three minutes the troopers subjected Mr. Weigel to force that they knew was unnecessary
to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and
death.  If true, this constitutes and unreasonable use of force under the Fourth Amendment." *Id.* at 1153.

1999)(finding that information existed in the law enforcement community, which put officers on notice of the dangers of positional asphyxiation).

In this case, DMPD officer are trained on the dangers of positional asphyxiation.  (D. App._86) The officers not only know the danger of positional asphyxiation generally, but also fully understand that placing weight on a prone/hobbled suspect increases the risk of positional asphyxiation.

> Q:    And does that risk for positional asphyxiation increase if there is some pressure – additional pressure that is being applied to their back?
>
> Becker:  It can depending on where the pressure is and how much is applied. (Defs. App. 175; Becker Dep. 28)
>
> *              *              *              *
>
> Q:    Does applying weight on a persons back when they're in a prone position and handcuffed position increase that risk [positional asphyxiation]?
>
> Dahlen:  Yes, it would.  (Defs. App. 220; Dahlen Dep. 35)

The DMPD also instructs its officer that a suspect should be rolled on their side once the hobble restraint is in place.  (Defs. App. 93, 99)  They are specifically instructed that a hobble restraint is "used to gain or maintain control of an **actively combative person**. . ."  (Defs. App. 90)(emphasis added).   Like the troopers in *Weigel*, the defendant officers in this case knew and appreciated the danger of placing pressure on the backside of a prone and hobbled suspect.  And like *Weigel*, a fact issue exists concerning whether Templeton was allowed to remain prone and hobbled with pressure applied to his back for an unnecessarily long period of time after he was well under control and no longer engaging in any behavior that presented a danger to himself or others.

The clearly established law in the Eighth Circuit prior to Templeton's arrest was that the resistance or combativeness of the suspect is an important factor in determining if the use of force in the form of a hobble or prone restraint is reasonable.   In *Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir. 1997), Ms. Mayard became extremely agitated with police after they issued a citation to her for selling liquor without a license. *Id*. at 1227.  Mayard was shouting and screaming at the police and activated an alarm system. *Id*.  The officers tried to place her in a squad car, but she struggled with them and attempted to pull away as attempts were made to handcuff her. *Id.*  After being forced into the squad car, Mayard began kicking and hitting an officer. In response, a hobble restraint was placed on her.  The court described the hobble as "a nylon rope placed around the legs that tightens when the detainee struggles."[5]  *Id.*   Mayard was transported to police headquarters.  It is during this trip that Mayard alleges that Officer Meyers slapped her in the face, punched her in the chest, and used a racial epithet.  *Id.*

The Eighth Circuit initially determined that the force used to take Mayard into custody and place her in the squad car was reasonable given her resistance.  *Id*. at 1228.  However, after viewing the facts in a light most favorable to Mayard, the court determined that "the force allegedly used against Mayard while she was handcuffed and hobbled in the car was not objectively reasonable." *Id*.  Accordingly, the Eighth Circuit reversed the district court's granting of summary judgement with respect to the excessive force claim against Officer Meyers.  *Id*.

In *Henderson v. Munn*, a physical struggle occurred during a traffic stop. *Henderson v. Munn*, 439 F.3d  497  (8th Cir. 2006).  Mr. Henderson was pulled from his car and landed face down. *Id.* at 500.  One officer had his knee in Henderson's back with one hand cuffed when officer Munn struck Henderson's right ankle with a heavy blow from a flashlight. *Id.*  As

---

[5]  The hobble was applied and remained on her while she was in the squad car so she most likely was not in a prone/face down position.

Henderson cried out in pain, the officer removed the knee from his back and was able to cuff the other hand. *Id.* "At that point, Henderson was lying face down on the ground with both arms restrained behind his back and in pain due to his leg injury. *Id.* Officer Munn then sprayed Henderson's face with pepper spray. *Id.* The Eighth Circuit affirmed the denial of summary judgment:

> Henderson denied resisting arrest. However, even assuming *arguendo* Henderson resisted arrest, at the time Officer Munn sprayed Henderson's face with pepper spray, Henderson was under control lying face down on the ground with both arms handcuffed behind his back. **In this compromising position, Henderson posed little or no threat to the safety of the officers or others. By the time Henderson was handcuffed and pinned face down on the ground, a reasonable jury could decide Henderson was no longer resisting arrest, even if he had resisted arrest before being subdued.** Additionally, Officer Munn's reference to the offenses for which Henderson was arrested—obstructing governmental operations by giving a false name, resisting arrest, public intoxication, and the two outstanding warrants for failure to appear—fails to tip the scales of reasonableness in Officer Munn's favor. **The negligible severity of such offenses did not necessarily justify the amount of force used against an individual who, according to Henderson's allegations, already had been subdued and restrained with handcuffs.** *Id.* at 503 (emphasis added).

At the time Templeton was pulled from his car by Officers Noble and Fong, he was admittedly acting erratically and strongly resisting attempts to restrain him. Templeton takes no issue with the amount of force used by Noble and Fong to initially gain control. In this case, much like *Henderson*, the police handcuffed and pinned Templeton face down in a compromising position. A reasonable jury could view the body camera footage in this case and easily find that shortly after the handcuffs were applied Templeton was no longer resisting and did not pose a safety threat to himself or the officers. Templeton's behavior became even more submissive after the hobble restraint was applied and pressure placed to his back side.

The severity of the offenses allegedly committed by Templeton were even less negligible than those committed in *Henderson*. Templeton drove his car off the road, but did

not injure anyone or cause any property damage.  After Templeton was subdued and under control, officers thoroughly searched his car and found prescription medication.  Templeton was charged with Possession of a Controlled Substance and Failure to Maintain Control.  (Defs. App. 31-32; Amended Complaint ¶ 30) Both charges were dismissed.  (*Id.*) The minor nature of these alleged offenses does not justify the amount of forced used and does not tip the scales of reasonableness in favor the defendant officers.

## II.     IOWA CONSTITUTIONAL LAW CLAIMS

Defendants do not contest that the relation back doctrine applies to claims against Dahlen and Cuppy.  While Defendants concede that Plaintiff's claims against two of the three officers relate back, they nevertheless argue that the court should dismiss the Iowa constitutional law claims as untimely and barred by Iowa's recently enacted qualified immunity law. *See* Iowa Code § 670.4A (2021).  Templeton's claims against all defendant relate back to the original filing and are therefore timely.  In addition, the newly enacted immunity statute is not retroactive and therefore does not apply to Templeton's claims. Even if the immunity provision is retroactive, using the statute to deprive Templeton of an accrued cause of action violates his state and federal due process rights. Finally, the immunity statute is unconstitutional in that it offends the doctrine of separation of powers.

### A.     Iowa Code § 670.4A Does Not Apply Retrospectively

Templeton's causes of action accrued on May 15, 2019. *See Thorp v. Casey's General Stores, Inc.*, 446 N.W.2d 457, 460 (Iowa 1989) (holding that a "cause of action accrues when an aggrieved party has a right to institute and maintain a suit.").  Templeton originally filed this case in state court on May 14, 2021. The immunity law was enacted on June 17, 2021—over two years after the causes of action accrued and one month after suit was filed. Because

Templeton's right to bring suit accrued prior to June 17, 2021; Section 670.4 can only be applied to Templeton's case if it is applied retrospectively. *See id.*

"The first step in determining whether a statute has retroactive effect is to assess whether the legislature expressly stated its intent that the statute should apply retrospectively." *Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 563 (Iowa 2015). This is because "a statute is presumed to be prospective in its operation unless expressly made retrospective." Iowa Code § 4.5 (2019). In this case, nothing in Section 670.4A indicates a legislative intent—express or implied—that the section should apply retroactively.

> "The next step is to ascertain whether the statute affects substantive rights or relates merely to a remedy." *Id.* If the law is substantive, we presume it operates prospectively only. If the statute is remedial, we presume it operates retrospectively. A statute is not remedial merely because one might say, colloquially, that its purpose is to "remedy" a defect in the law. [I]f a mere legislative purpose to remedy a perceived defect in the law made a statute remedial, very few statutes would not fall within this classification. . . . When a statute creates new rights or obligations, it is substantive rather than procedural or remedial. *Id.*

In *Dindinger*, the Iowa Supreme Court considered whether an amendment to the Iowa Civil Rights Act was remedial or substantive in nature. This amendment created a new cause of action for wage discrimination with a new strict liability standard for employers. *Id.* at 564. The Court therefore found that the ICRA amendment was substantive and did not operate retrospectively. *Id.* at 566.

Just as in *Dindinger*, the qualified immunity in section 669.14A creates new rights for state employees and limits the rights of plaintiffs bringing suit against government entities and their employees. This statute does not touch on remedies recoverable by an aggrieved person. The only procedural component of the statute is section 670.4A(4), which states "any decision by the district court denying qualified immunity shall be immediately appealable." However, the

single procedural component of the statute does not mean the entire statute is applied

retroactively  "[w]hen only part of an enactment is remedial or procedural, effect is ordinarily

given to that part." *State ex rel. Buechler v. Vinsand*, 318 N.W.2d 208, 210 (Iowa 1982). Because

the section Defendants wish to apply is clearly substantive, it cannot be applied retrospectively.

The actions giving rise to Templeton's claims occurred before the enactment of Section

670.4A. Because the statute does not expressly state it is applied retroactively, and the section in

question affects substantive rights, it cannot be applied retrospectively. Judge Lawrence

McLellan recently addressed this very issue and held: "Accordingly, the court concludes that

because the statute does not expressly state it is to be applied retroactively and the section affects

substantive rights it should not be applied retroactively."[6]  Defendants' argument that section

670.4A applies to Templeton's claims should be rejected.

**B.      Applying Section 670.4A to Plaintiff's Claims Violates his State and Federal Due Process Rights**

Because Templeton's right to bring suit accrued prior to June 17, 2021, the immunity

statute cannot be applied retroactively to deprive him of his cause of action. *See id.*  Doing so

deprives Templeton of his due process rights under the state and federal constitutions.

The Iowa Supreme Court directly addressed this situation in *Thorp v. Casey's General

Stores, Inc.*, 446 N.W.2d 457 (Iowa 1989). In that case, the plaintiff was injured on April 1, 1985

by a drunk driver. *Id.* at 459. In 1986 the Dramshop Act was amended and made major changes

to the law, including changes that were fatal to the plaintiff's case against the defendant. *Id.* On

appeal the plaintiff argued that the 1986 amendments did not apply to his claim. *Id.*   The Iowa

---

[6] Carver-Kimm v. Kim Reynolds, et. al., (Iowa District Court for Polk County; LACL148599) (12/22/2021) (P. App.000074-000101)

Court agreed, holding that once a cause of action has accrued the legislature cannot deprive a plaintiff of that cause of action. *Id.* at 460-61.

> It is well-settled that the legislature may not extinguish a right of action which has already accrued to a claimant. There is a vested right in an accrued cause of action . . . A law can be repealed by the law giver; but the rights which have been acquired under it, while it was in force, do not thereby cease. . . .

*Id.* at 460 (quoting *Gibson v. Commonwealth*, 415 A.2d 80, 83 (Pa. 1980).

*Thorpe* held that applying a subsequently enacted statute to deprive a plaintiff of an accrued cause of action would violate the plaintiff's due process rights under the state and federal constitutions. *See id.* at 463 (holding "we believe that plaintiff had a vested property right in her cause of action against Casey's and that retroactive application of the 1986 amendment destroyed that right in violation of due process under both the federal and state constitutions.").

### C.      Applying Section 670.4A to Plaintiff's Iowa Constitution Claim Offends the Principals of Separation of Powers

The Iowa legislature acted outside the scope of its authority in attempting to define the meaning of the Iowa Constitution. "There is no question as to a legislature's power to retroactively cure defects in existing statutes or to modify them to restrict or expand their reach. The general rule is that a legislature may do anything by curative act which it could have done originally." See *City of Muscatine v. Waters*, 251 N.W.2d 544, 548-49 (Iowa 1977); *Chicago, Rock Island and Pacific Railway Co. v. Rosenbaum*, 212 Iowa 227, 231, 231 N.W. 646, 648 (1930); *Windsor v. City of Des Moines*, 110 Iowa 175, 179, 81 N.W. 476, 477 (1900); and *Richman v. Supervisors Muscatine County*, 77 Iowa 513, 519-20, 42 N.W. 422, 425 (1889). However, because Iowa Code § 670.4A attempts to define not only the meaning of the Iowa Constitution, but to limit the impact of the rights guaranteed by the Iowa Constitution, it invades the job of the courts, particularly the Iowa Supreme Court.

In *Frink v. Clark,* 285 N.W. 681, 683 (1939), the Iowa Court interpreted a change in service of process rules by the Iowa Legislature. "The Forty-seventh General Assembly enacted a statute known as chapter 234, which undertook to permit service of process upon a nonresident who is attending a trial as a defendant in a criminal action in the state of Iowa, and to provide that the rule should apply to cases then pending." *Id*. The defendants in *Frink* argued the amended rules were unconstitutional for various reasons, including, as follows:

> [The legislation] purports retroactively to make valid that which was originally invalid, which is beyond the legislative power; that the statute deprives appellants of vested rights which the legislature cannot take away; that the legislature is without power to invalidate a valid defense exclusively cognizable by the courts; that the act violates section 1 of the 14th Amendment to the Constitution of the United States, in that it attempts to abridge the privileges and immunities of citizens of the United States, and violates said amendment and section 9 of Article I of the Constitution of Iowa in that it attempts to deprive appellants of property without due process of law, is also unconstitutional as an attempt to interfere with the jurisdiction and process of the federal courts and because it denies equal protection of the laws and is arbitrary class legislation. *Id.*

The *Frink* court noted that the "immunity from service of civil process of a witness while attending a trial in a state other than that of his residence to give evidence seems to be universally recognized. The privilege protects him in coming, in staying, and in returning, if he acts in good faith, and without unreasonable delay." *Id*. at 683. The *Frink* court reasoned that "this action was commenced before the curative act became effective, it is apparent, we think, that the second section thereof is unconstitutional and beyond the power of the Legislature." *Id*. at 867. The Iowa Court noted that '[a]fter action is brought it is certainly beyond the power of the Legislature to declare that action void and the court in which it is pending without jurisdiction. Such matters are purely judicial, and not legislative, and under our three-department system of government it is inadvisable for one to assume the powers, duties, or responsibilities of the other." *Id*.

In *Richardson v. Fitzgerald*, 109 N.W. 866, 867 (1906) the Iowa Court stated, "it is the province of the Legislature to enact, of the judiciary to expound, and of the executive to enforce, the laws, and any direction by the Legislature that the judicial function shall be performed in a particular way is a plain violation of the Constitution." In *Wagner v. State*, the Iowa Court held that damage claims filed against state officials of Iowa, can only be regulated by the Iowa legislature if they do not deny Iowan's an adequate remedy. *Wagner v. State of Iowa*, 952 N.W.2d 843, 847 (Iowa 2020). In the present case, disregarding the Supreme Court's "all due care standard" may prevent Templeton from obtaining any remedy at all.

The new code section relied upon by the Defendants is unconstitutional because the Iowa Supreme Court has already ruled that qualified immunity under the Iowa Constitution is based upon the "all due care" standard. The language in *Baldwin* makes it clear that the Iowa Supreme Court was interpreting the Iowa Constitution in a manner consistent with the intent of the founders of the State of Iowa,

> We believe instead that qualified immunity should be shaped by the historical Iowa common law **as appreciated by our framers** and the principles discussed in Restatement (Second) of Torts section 874A. This means due care as the benchmark. Proof of negligence, *i.e.,* **lack of due care, was required for comparable claims at common law at the time of adoption of Iowa's constitution. See Hetfield, 3 Greene at 585; Howe, 12 Iowa at 203-04**.

*Baldwin v. City of Estherville*, 915 N.W.2d 259, 280, (Iowa 2018)(*Baldwin II*)(emphasis added). In other words, the court created *Harlow* immunity which came into existence in 1982 is not consistent with the intent of those who framed the Iowa Constitution in 1857.

The proponents of the new legislation specifically argued that it was intended to overturn *Baldwin*. Senator Dawson, referring to the *Baldwin* case, claimed "I would submit to the body here that the Supreme Court got it wrong on that particular case, and what we are trying to do is put this genie back in the bottle." S.F. 476, Iowa Senate Floor Debate at 7:21. The legislature

may not amend the Iowa Constitution in a single session, or without the express consent of the people of Iowa. *See* Iowa Constitution, Article X. The Iowa Supreme Court, not the Iowa legislature, decides the proper meaning and interpretation of the Iowa Constitution.

In *Baldwin II* the Iowa Supreme Court specifically rejected the *Harlow* federal qualified immunity language, as adopted by the Iowa legislature, and for very good reason. *Id.* at 279. The Iowa Supreme Court reasoned, as follows:

> As we have noted, a number of states allow *Harlow* immunity for direct constitutional claims. In those jurisdictions, there cannot be liability unless the defendant violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. *Harlow* examines objective reasonableness; thus, in some ways it resembles an immunity for officials who act with due care. However, it is centered on, and in our view gives undue weight to, one factor: how clear the underlying constitutional law was. Normally we think of due care or objective good faith as more nuanced and reflecting several considerations. See, *e.g.*, *Hetfield*, 3 Greene at 585. Factual good faith may compensate for a legal error, and factual bad faith may override some lack of clarity in the law. *Id.*

The Iowa legislature does not have the power to overturn a decision of the Iowa Supreme Court that is based upon the Supreme Court's interpretation of the Iowa Constitution

### D. Defendants are Not Entitled to Immunity Under the All-Due-Care Standard

#### 1. *Baldwin II* and the All-Due Care Affirmative Defense

The Iowa Court in *Baldwin II* agreed to answer a certified question from the federal district court regarding whether a qualified immunity defense was available to defendants with respect to claims brought directly under the Iowa Constitution. In responding to the certified question, the Iowa Court held that qualified immunity was available and sketched out in general terms the nature of the affirmative defense. *Baldwin II* specifically addressed alleged violations of Article 1, sections 1 (Rights of Persons) and 8 (Searches and Seizures) of the Iowa Constitution. The Court determined that strict liability was not the correct standard and that

qualified immunity should be available to defendants "who plead and prove as an affirmative defense that they exercised all due care to conform to the requirements of the law." *Id*. at 279.

In discussing the newly minted standard, *Baldwin II* cites approvingly to Professor Jeffries critique of the federal immunity standard laid out in *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). *Id. See, John C. Jeffries Jr., The Liability Rule for Constitutional Torts*, 99 Va. L.Rev. 207 (2013).

> In the end, Professor Jeffries condemns *Harlow* as "an overly legalistic and therefore overly protective shield," but advocates for a more straightforward "protection of reasonable error." Id. at 258-260. "The problem with current law is its implicit equation of reasonable error with the space between decided cases." Id at 260.
>
> We agree. Constitutional torts are torts, not generally strict liability cases. Accordingly, with respect to a damage claim under article I, sections 1 and 8, a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law. *Baldwin II* at 281.

*Baldwin II* deviated from *Harlow* and its successors with its finding that federal qualified immunity gives undue weight to one factor: the clarity of the law surrounding the underlying constitutional tort. *Id*. at 279. *See, Clinton v. Garrett*, 2021 WL 3503958 (S.D. Iowa 2021). Instead, the Iowa Court opted for an approach that was more "nuanced" and "reflecting several considerations" such that factual good faith arguments might compensate for legal error and factual bad faith may override some lack of clarity in the law. *Baldwin II*, 915 N.W.2d at 279.

## 2.    *The Contours of the All-Due Care Affirmative Defense*

Shortly after the Iowa Supreme Court answered the certified question in *Baldwin II,* Judge Bennett issued a careful and thoughtful analysis of this new affirmative defense. *Baldwin v. City of Estherville*, 333 F.Supp.3d 817 (N.D. Iowa 2018) ("*Baldwin III*").

36

First, Judge Bennett noted that *Baldwin II* found that the "right to recover damages for a constitutional violation does not need to be congruent with the constitutional violation itself." *Baldwin III,* 333 F.Supp.3d at 842.   In other words, a determination that Baldwin's rights under the Iowa Constitution were violated does not necessarily mean that he was entitled to recover damages for that violation.   *Id.*   The result is the same under the federal immunity standard where an officer may still be immune if the constitutional right violated was not clearly established.   *Saunders v. Thies*, 2020 WL 10731253 (S.D. Iowa 2020).

Second, the all-due care qualified immunity defense embodies a "negligence" standard. *Baldwin III*, 333 F.Supp.3d at 843.   While "objective reasonableness" of the defendant's conduct is relevant to qualified immunity under both the Iowa and U.S. Constitutions, the defense is not based on "all due care" standing alone but "all due care to conform to [or with] the requirements of the law." *Id.*   There is no question that "exercising all due care to conform with the requirements of the law" imposes a greater burden on defendants that not violating "clearly established . . . constitutional rights of which a reasonable person would have known."   *Harlow*, 457 U.S. at 818.   *See, Saunders*, 2020 WL at *11 ("the requirement to establish 'all due care immunity' under Iowa law, by proving the he or she was not negligent, is more 'stringent' than the federal standard.); *Ohlson-Townsend v. Wolf*, 2019 WL 6609695 (N.D. Iowa 2019)("[t]he court finds that the Iowa standard for qualified immunity is more stringent than the federal standard.").   *See also, Wendt v. Iowa*, 971 F.3d 816, 820 (8th Cir. 2020)(*Baldwin* immunity defense to Iowa constitutional law claims differs from the federal standard).

The Iowa Court in *Baldwin II* explained the difference between federal and Iowa qualified immunity as follows:

> As we have noted, a number of states allow *Harlow* immunity for direct constitutional claims.   In those jurisdictions, there cannot be liability unless

defendant violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct.at 2738.  *Harlow* examines objective reasonableness; thus in some ways it resembles an immunity for officials who act with due care.  **However, it is centered on, and in our view gives undue weight to, one factor: how clear the underlying constitutional law was.** Baldwin II, 915 N.W.2d at 279 (emphasis added).

While the distinction is nuanced, Judge Bennett explained his reasoned interpretation as follows:

> The distinction appears to me to be between <u>taking reasonable action</u> to "conform" to the requirements of the law, under the Iowa "all due care" qualified immunity standard, and <u>avoiding action </u> one should reasonably know would violate the law, under the *Harlow* federal qualified immunity standard.  *Baldwin III*, 333 F.Supp.3d at 843 (emphasis supplied).

While "good faith" is irrelevant to the constitutional violation, it remains relevant to damages and hence the "all due care" immunity.  Id. at 843-844.  In Judge Bennett's view evidence of bad faith, malice, lack of probable cause or reasonable grounds for the conduct at issue are factors that would prevent a defendant from utilizing Baldwin immunity.

### 3.    *Application of __Baldwin__ Qualified Immunity Affirmative Defense*

One of the questions left unresolved in *Baldwin II* was whether all due care immunity is exclusively for the jury or subject to disposition at summary judgment.  *Id*. at 842.  Judge Bennett concluded that, in the absence of genuine issues of material fact, the court should decide all due care immunity at summary judgment. *Id*. at 841.  *See, Saunders v. Thies*, 2020 WL at *11 (same).  Templeton agrees that this Court can properly decide the applicability of the *Baldwin* immunity via the pending motion.

In deciding all due care or *Baldwin* immunity the trial asks two questions:  (1) whether the defendant violated an Iowa constitutional right; and (2) if a violation has been proved (or a genuine issue of material fact exists that there was a violation) the court considers whether the official "exercised all due care to conform to the requirements of the law."  *Saunders*, 2020 WL at *11.

The Iowa Supreme Court has determined that Article I, Section 8 of the Iowa constitution is self-executing. *McClurg v. Brenton*, 123 Iowa 368, 371, 98 N.W.881, 883 (1904).  Despite its nearly identical language, the Iowa Court has read Article I, § 8 to confer more expansive rights than the Fourth Amendment. *Clinton v. Garrett*, 551 F.Supp.3d 929, 950 (S.D. Iowa 2021). The same facts and reasons which support a denial of federal qualified immunity supports a denial of *Baldwin* qualified immunity which unquestionably imposes a higher burden on defendants when proving the affirmative defense.  *See e.g. Clinton*, 551 F.Supp.3d at 953 (denying *Baldwin* immunity for claim under Article I, S8); *Williams v. City of Burlington*, 516 F.Supp.3d 851, (S.D. Iowa 2021 ), aff'd, 27 F.4th. 1346 (8th Cir. 2022) (district court found no immunity under the Iowa Constitution in excessive force case).

## III.   TEMPLETON'S CLAIMS ARE NOT TIME-BARRED

### A.   Templeton's Amended Complaint Relates Back to the Original Filing on May 14, 2021

#### 1.   Defendants Cuppy and Dahlen

With respect to Defendants Cuppy and Dahlen, the City concede that the Amended Complaint relates back to the original filing on May 14, 2021.  In their Brief in Support of Response to Plaintiff's Motion to Amend Complaint filed March 1, 2022 [Doc.23-1]("Defendant's Brief on Motion to Amend")   Defendants make the following representation: "For the most part the Defendant concedes the assertion against Cuppy and Dahlen do conform, at least in regard to the Federal claim appear to meet that requirement to relate back." (Defendant's Brief on Motion to Amend p. 5)  Magistrate Judge Jackson  noted this concession: "Here, Templeton's motion to file the proposed amended complaint as at least to a portion of Count I against Dahlen and Cuppy is not challenged."  (Order filed 03/28/2022 p. 10)[Doc. 32]

Accordingly, the claims in Counts I and II against Cuppy and Dahlen relate back to the original

filing on May 14, 2021 and are therefore timely.

### 2.     The Relation Back Doctrine is Satisfied With Respect to Defendant Becker

Defendants did not previously concede that the claims against Becker relate back.

However, they do not dispute the fact that the Fed. R. Civ. Pro. 15(c)(1)(A)-(B)'s requirements

have been met. (Defendant's Brief on Motion to Amend at 5-6)[Doc.23-1]  The sole argument

previously urged by Defendants was that Becker did not receive notice of the action and would

have no reason to know within 90 days of suit being filed that he would have been sued but for

the mistake in identity.

To relate an amendment back to the date of the original pleading, the party to be brought

in by amendment must, within the time period provided in Fed R. Civ. Pro. 4(m), have notice of

the suit and known or "should have known" that they would have been sued but for a mistake in

identity. Fed R. Civ. Pro. 15(c)(1)(C)(i)-(ii). This notice must have occurred within 90 days from

the filing of the original complaint. See Fed R. Civ. Pro. 4(m), 15(c)(1)(C). Notice in this context

can be actual or constructive. *See Lee v. Airgas Mid-South, Inc.*, 793 F.3d 894, 896 (8th Cir.

2015). Constructive notice can be found under the "identity of interest" doctrine. See *Schrader v.

Royal Caribbean Cruise Line, Inc.*, 952 F.2d 1008, 1012 (8th Cir. 1991). Under the identity of

interest doctrine, "timely notice of the suit to a related entity may be imputed to the proper

defendant." *Schrader*, 952 F.2d at 1012 (*quoting Korn v. Royal Caribbean Cruise Line, Inc.*, 724

F.2d 1397 (9th Cir. 1984)); *Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir. 1998). While the U.S.

Supreme Court has not yet adopted the "identity of interest" exception, it has noted that "[t]imely

filing of a complaint, and notice within the limitations period to the party named in the

complaint, permit imputation of notice to a subsequently named and sufficiently related party."

*See Schiavone v. Fortune,* 477 U.S. 21, 29 (1986).

Officer Becker, like the other Defendants (City of Des Moines and Officers Dahlen and Cuppy), are represented by City Attorney, John Haraldson. Mr. Haraldson, presumably, investigated Plaintiff's allegations against Officers Fong and Noble, but nevertheless claims to have not been "aware that Officer Becker applied the hobble-tie to the Plaintiff until . . . being expressly asked by Plaintiff's counsel [on December 9, 2021]."  (Defendant's Brief on Motion to Amend at p. 9)  It is difficult to fathom how an investigation concerning the allegations made in the Petition would not involve an inquiry of which officer actually applied the hobble restraint. However, whether Mr. Haraldson knew that Becker applied the hobble-tie is not dispositive on this issue. What matters is whether Mr. Haraldson's investigatory efforts provided Becker notice of the suit (clause A notice) and whether Becker knew or should have known that he would have been sued but for a mistake in identity (clause B notice). *See Jacobsen*, 133 F.3d at 320; Fed. R. Civ. Pro. 15(c)(1)(C). As discussed below, Mr. Haraldson's role as City Attorney and his investigation of Plaintiff's allegations either directly or indirectly gave Becker sufficient notice. *See Jacobsen*, 133 F.3d at 320.

Defendants contend that Becker received neither clause A nor clause B notice until December 9, 2021.  (Defendant's Brief on Motion to Amend at p. 9)   In actuality, however, Becker learned of Templeton's allegations against Officers Fong and Noble in "the Summer of 2021," and he knew the allegations related to "an incident where [he] and several other law enforcement personnel . . . were present." (P. App. 000067; Affidavit of Becker ¶¶ 3-4,) Becker even knew that Plaintiff's allegations stemmed from how Plaintiff "was removed from his car or the fact he was arrested." (*Id.*; Affidavit of Becker ¶ 5) Becker always had actual knowledge that he was the person who applied the hobble-restraint and by the Summer of 2021 also knew that a

41

lawsuit had been filed surrounding that same detention and restraint of Templeton. (*Id.*; Affidavit of Becker ¶¶ 4, 9-10)  In addition, Templeton's lawsuit received media attention. On May 20, 2021, the Des Moines Register printed an article with the following headline: "Two Des Moines officers target of an excessive force lawsuit alleging they 'hog-tied' man suffering a seizure." (P. App.000069-000073)  Des Moines Police Department spokesperson, Sgt. Paul Parizek, told the Register that "the department and officers involved are not permitted to comment on pending litigation." (*Id.*)

Based upon these facts, Becker had actual and/or constructive notice that: (1) Plaintiff was suing Officers Noble and Fong; (2) the lawsuit related to how Plaintiff had been arrested; (3) that he (Becker) was present and participated in the restraint of Plaintiff ; and (4) that he (Becker) was the person who applied the hobble restraint. Consequently, Becker had notice of the suit (clause A notice) and knew or should have known that he—as the individual who hobble-tied Plaintiff— would have been sued but for Plaintiff's mistake in identity (clause B notice). See Fed R. Civ. Pro. 15(c)(1)(C)(i)-(ii); *Jacobsen*, 133 F.3d at 320.

Moreover, the officers involved in the restraint of Templeton did not document their use of the hobble as required by department rules.  The "In-Custody Deaths and Asphyxiation" training given by Becker contains a heading "Documentation" and states:  "The use of a hobble tie **shall** be appropriately documented in the officers CIR[7] or Supplemental Report." (Defs. App. 94)(emphasis added).  The reports completed by Noble and Fong failed to mention that a hobble restraint was used on Templeton.  Noble's report fails to mention that Becker was even on the scene that day. (P.App. 000011-000012)   Fong's report makes a passing reference to "Becker," but gives no indication as to his involvement.  (P.App. 000013-000015)  Templeton, of course,

---

[7] Case Investigation Report

has no memory of any of the events.  If the defendants had properly documented their use of the hobble as required by their own rules, then Templeton would have known of Becker's involvement prior to filing suit.   Defendants should not be allowed to gain advantage by playing "hide the ball."  Such precedent would actually encourage law enforcement to conceal material facts in their reports.

Having satisfied the requirements of Fed. R. of Civ. Pro. 15(c)(1)(C), Templeton's claims against Becker (as well as Dahlen and Cuppy, which Defendants' concede) relate back to the date of original complaint. *See Heglund v. Aitkin County*, 871 F.3d 575, 578- 579 (8th Cir. 2017) ("When [the requirements of Fed. R. Civ. Pro. 15(c)(1)(C)] are satisfied, the amended complaint is treated as if it were filed on the date of the original complaint.") (*citing Hayes v. Faulkner County, Ark*., 388 F.3d 669, 675-676 (8th Cir. 2004)). Accordingly, Templeton's claims against Officers Becker, Dahlen, and Cuppy are not time-barred. *See Heglund*, 871 F.3d at 578-579; *Hayes*, 388 F.3d at 676

### 3.      Negligent Supervision and *Respondeat Superior* Liability

As previously argued, Templeton asserts that Officers Dahlen, Becker and Cuppy acted with unconstitutionally excessive force.  If the court finds that Templeton has generated a fact issue with respect to Count I, then his claim of negligent supervision against the City should also survive summary judgment.  The municipal tort claims act states in pertinent part:  "Except as otherwise provided in this chapter, every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties. . . "  Iowa Code S 670.2 (2021).   A tort is defined in the act as "every civil wrong which results in wrongful death or injury to person or injury to property . . . and includes but is not restricted to . . . **denial or impairment of any right under any constitutional provision or rule or law**."

Iowa Code S 670.1(4)(2021)(emphasis added).  Accordingly, the City may be held liable under a
*respondeat superior* liability theory for the constitutional torts of its officers and employees
acting in the course of their duties.

In addition, there is record evidence that on May 15, 2019, the City was negligent in its
supervision of Becker, Cuppy, and Dahlen.  Numerous supervisors were present that day
including Sergeants Fong, Parizek, Carney and Wessels. (Defs. App. 180, 183; Becker Depo. 48,
58-59) Sergeant Crouse was also present and his interactions with Templeton and the officers on
scene is well-documented.   The DMPD "Use of Force" policy provides:  "Officers, regardless of
tenure or rank, have a duty to intervene to prevent or stop the use of unreasonable force by
another officer when it is safe and a reasonable opportunity exists."  (Defs. App. 199) All of
these supervisory personnel witnessed the unlawful and unconstitutional conduct of Becker,
Cuppy and Dahlen and did nothing to correct their behavior or otherwise bring it to a stop – in
fact, they courage the behavior.

WHEREFORE, Plaintiff Nicholas Templeton respectfully requests that this Court deny
Defendants Motion for Summary Judgment.

*/s/ Thomas J. Duff*
*/s/ Jim T.  Duff*
DUFF LAW FIRM, PLC
The Galleria
4090 Westown Pkwy, Suite 102
West Des Moines, Iowa 50266 (515) 224-4999

jim@tdufflaw.com  tom@tdufflaw.com

*/s/ Benjamin K. Lynch*
Benjamin K. Lynch, AT0013089
The Law Offices of Benjamin K. Lynch, PLC8550
Hickman Road, Clive, Iowa 50325
(515) 276-3921
ben@benlynchlaw.com
**ATTORNEYS FOR PLAINTIFF**

Original electronically filed with copies to:

JOHN O. HARALDSON
Assistant City Attorney
City Hall, 400 Robert D. Ray Dr.
Des Moines, Iowa  50309-1891
Email:  JOHaraldson@dmgov.org

ATTORNEY FOR DEFENDANTS